570 A.2d 1338

COMMONWEALTH of Pennsylvania

v.

Thomas W. JONES, Appellant.

Superior Court of Pennsylvania.

Argued August 15, 1989.

Filed March 8, 1990.

Reargument Denied May 2, 1990.

294

296

Robert L. Hickok, Philadelphia, for appellant.

Frances G. Gerson, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before WIEAND, BECK and MONTGOMERY, JJ.

OPINION BY BECK, Judge:

Appellant, Thomas W. Jones, was tried and convicted by a jury of first degree murder [1], robbery [2], and possession of an instrument of crime [3]. After a sentencing hearing immediately following the trial, the jury elected to sentence appellant to death. Post-verdict motions were denied and appellant took a direct appeal to the Supreme Court. The

1. 18 Pa.Cons.Stat.Ann. § 2502 (Purdon 1983).
2. 18 Pa.Cons.Stat.Ann. § 3701 (Purdon 1983).
3. 18 Pa.Cons.Stat.Ann. § 907 (Purdon 1983).

Supreme Court remanded to the trial court for an evidentiary hearing on the allegations of ineffectiveness of counsel. On the basis of evidence adduced at the remand hearing, the judge found ineffective assistance of counsel at the penalty phase only of the original trial. As a result of that finding, the Supreme Court granted appellant's request for extraordinary relief and ordered that the death penalty be vacated and a life sentence imposed, 520 Pa. 68, 550 A.2d 536. It is from the imposition of this life sentence which appellant now appeals.[4] In his appeal to this court appellant raises numerous allegations of error which he claims entitle him to a new trial. We find his claims to be without merit and affirm the judgment of sentence.

The evidence which formed the basis for the convictions of first degree murder and related charges is as follows. Appellant Jones, who at the time of the crime was twenty years old, was involved in a short-lived homosexual liaison with the victim, fifty-three year old Herbert Wenger. On the night Wenger was murdered, Friday, January 15, 1982, he and Jones entered Wenger's apartment just after midnight. Not long afterward, Wenger's upstairs neighbor was awakened by a sharp, loud noise which was followed by the muffled sound of voices. One of the voices protested "no" and "stop" and then another sharp retort rang out. After that there was silence. No one was seen leaving Wenger's apartment but later that night Wenger's 1978 Oldsmobile, in which he and appellant had arrived, was gone.

4. The murder trial at which appellant was convicted was presided over by the Honorable Eugene Gelfand. On remand from the Supreme Court, the evidentiary hearing was held before the Honorable Charles L. Durham. For the sake of clarity, hereinafter references to Judge Gelfand will be to the "trial judge" and references to Judge Durham will be to the "remand judge".

In addition, during the lengthy course of this criminal proceeding appellant has been represented by four different attorneys. Again for the sake of clarity and brevity, they shall be referred to as "trial counsel", "post-verdict counsel", "remand counsel" and "appeals counsel", depending on which procedural stage they assisted appellant in his cause.

For days Wenger's friends tried unsuccessfully to contact him. Finally, on Tuesday morning January 19, Emil Fox contacted the police, alarmed that Wenger was missing especially since Fox was supposed to drive him to the airport that morning to begin a vacation. Fox and the police entered Wenger's apartment to find him dead in the bathtub.[5] Wenger had been shot twice with a .25 caliber gun. One bullet hit Wenger at the base of his neck, travelled downward and lodged in his spine. The other shot was through his head.[6] Missing from Wenger's apartment, in addition to his car, were his wallet, driver's license and all of his keys. Wenger's assailant apparently had taken Wenger's keys and locked him into the apartment, for the dead bolt lock had been secured from the outside and no keys were found inside the apartment. Appellant's wallet containing identification and a photograph of appellant was found in Wenger's living room.

Meanwhile, the night after the murder, appellant drove Wenger's car to a convenience store where he attempted to sell a .25 caliber gun to the store manager, James Green.[7] Green, who was acquainted with appellant, commented that the weapon was "dirty" to which appellant replied, "Yeah, I just fired it the other day". Green refused to purchase the gun. At the same time, appellant solicited Green's help in opening the gas cap to the stolen Oldsmobile because he apparently was unfamiliar with its operation.

About four days after the killing, on the day the police discovered Wenger's body, appellant was involved in a minor automobile accident with a Sears repair truck. When the driver of the truck attempted to exchange identification

5. Fox and the police obtained the keys to Wenger's apartment from an elderly neighbor down the street who was entrusted with the care of Wenger's apartment while he was away on vacations. Fox testified that two keys were required to open the front door—one for the dead bolt lock and one for the regular cylinder lock.

6. The police also recovered a misfired .25 caliber bullet from the hallway between Wenger's bedroom and bathroom.

7. Specifically, Green testified that the weapon appellant tried to sell him was a R & G .25 caliber automatic which Green recognized because his hobby is firearms.

and other information with appellant, appellant at first evaded the issue and then hurriedly left the scene without providing the requested information. The driver of the Sears truck copied the license number and called the police.

That evening the police, having been alerted that the car was stolen in connection with a homicide, spotted appellant driving the Oldsmobile home. He was stopped and arrested in front of his house. The trunk and gas cap keys were in appellant's pocket along with the vehicle's registration in Wenger's name. Later that night, appellant gave a statement to the police acknowledging having been with Wenger on the night of the murder but denying any connection to Wenger's death. He insisted that Wenger, with whom he admitted being "sexually involved", had loaned him the car for his birthday, January 16, the day following the murder. Appellant further stated that he tried to reach Wenger after the accident with the Sears truck and even "went around his house" but couldn't get in because Wenger "never gave [him] a key".

Later the same night police obtained a search warrant for appellant's home which was executed at 2 A.M. Inside appellant's bedroom the police found the two front door keys to Wenger's apartment, Wenger's driver's license, credit cards, other forms of identification and a safe deposit box key belonging to Wenger. Wenger's wallet and other credit cards had been found earlier in the glove compartment of the stolen car. Thereafter the police arrested appellant for the murder of Herbert Wenger.

Appellant makes the following claims of error which we will address in order: 1) trial counsel had a conflict of interest which deprived appellant of effective assistance of counsel; 2) the evidence was insufficient to sustain the convictions for first degree murder and robbery; 3) the trial court impermissibly restricted the voir dire of prospective jurors; 4) the prosecutor was guilty of misconduct during his closing argument; 5) the trial court gave the jury several erroneous instructions on the law; and 6) the trial court erred in denying appellant's motion to suppress evi-

dence. We find that none of these claims entitles appellant to relief.

With respect to appellant's first claim of error, i.e. that he was denied the effective assistance of counsel because of an alleged conflict of interest on the part of his trial attorney, we find that this issue has not been preserved for appellate review. Appellant alleges that trial counsel had a conflict of interest which prejudiced his handling of appellant's homicide case because appellant's trial counsel had previously represented appellant's brother-in-law in an assault case in which the brother-in-law was accused of shooting appellant in a family-based dispute. Apparently, trial counsel had been hired by the family to represent the brother-in-law in the assault case (in which appellant was the complainant) and later also was hired to represent appellant in this pending but wholly unrelated murder prosecution. Because appellant was reluctant to proceed against a family member, the charges against the brother-in-law were nol prossed about three months prior to the beginning of appellant's homicide trial.

After the conclusion of the murder trial and after imposition of the death penalty, trial counsel was replaced by post-verdict counsel who prepared and argued post-verdict motions and also represented appellant in his original direct appeal to the Supreme Court. The ineffectiveness of trial counsel based on an alleged conflict of interest was not raised by post-verdict counsel in any form whatsoever. Appellant does not dispute this fact. The issue of a conflict of interest was raised for the first time by remand counsel during the evidentiary hearing before the remand court. Remand counsel asserted trial counsel's ineffectiveness, but failed to raise post-verdict counsel's ineffectiveness. Appellant was represented by different lawyers during trial and at the post-verdict stage. The Commonwealth argued at that time to the remand court and continues to argue to this court that under these circumstances the issue of conflict has been waived. We agree.

■ A claim of ineffective assistance of counsel must be raised at the earliest stage in the proceedings at which counsel whose effectiveness is being challenged no longer represents appellant. *See, e.g., Commonwealth v. Cargo,* 498 Pa. 5, 444 A.2d 639 (1982); *Commonwealth v. Seachrist,* 478 Pa. 621, 387 A.2d 661 (1978); *Commonwealth v. House,* 371 Pa.Super. 23, 537 A.2d 361, 363 (1988). Here, new counsel entered an appearance at the post-verdict stage and was therefore required to raise any claim of previous counsel's ineffectiveness in order to preserve it for review. *Commonwealth v. House,* 537 A.2d at 363. While trial counsel's ineffectiveness was asserted with respect to voir dire and the penalty phase of appellant's trial, post-verdict motions did not address the particular contention at issue here. As such, that issue cannot be considered on appeal. *Commonwealth v. Quarles,* 361 Pa.Super. 272, 279, 522 A.2d 579, 582, *appeal denied,* 517 Pa. 592, 535 A.2d 82 (1987).

■ In fact, appellant does not even claim that the conflict of interest was raised in a timely fashion below. Instead, he asks this court to address the merits of the claim despite the failure to have raised it at the post-verdict stage based on three arguments. First, appellant claims that the Supreme Court, in its remand order, specifically directed us to hear "those issues which were presented in the initial appeal and were not considered, *as well as any other issues that may be deemed appropriate for review."* From the underscored language appellant argues that somehow he has been granted an expanded right to appeal unpreserved issues by the Supreme Court. We think this is an unwarranted interpretation of the remand order. We can only conclude that issues "appropriate for review" are those issues which have been properly preserved for our review under traditional and established concepts of waiver and preservation. Therefore, appellant cannot look to the remand order to carve out an exception to the application of ordinary standards of appellate review.

■ Next appellant argues that the first "real" opportunity to present the issue of conflict of interest was at the remand stage because there was no evidence that post-verdict counsel knew of the conflict in order to argue it. This contention begs the question. Nothing in the record explains why the conflict could not have been known as easily by post-verdict counsel as by remand counsel. Appellant, his family, and trial counsel were the sources of information necessary to develop any argument regarding an assertion of a conflict of interest. Presumably, these sources were as available to post-verdict counsel as they were to remand counsel. In any event, nothing in the record indicates otherwise and we refuse to engage in guesswork.

■ Finally, appellant argues that the remand court addressed the issue of ineffectiveness based on the asserted conflict of interest and therefore the issue is preserved. We cannot agree. The remand court's decision to consider the conflict claim despite the Commonwealth's assertion of waiver does not alter our conclusion that the complaint was untimely and has not been preserved. *Cf. Commonwealth v. Heckman,* 366 Pa.Super. 224, 530 A.2d 1372 (1987); *Commonwealth v. Philpot,* 491 Pa. 598, 421 A.2d 1046 (1980).

Next appellant argues that the evidence at trial was insufficient to sustain the murder and robbery convictions. With respect to the first degree murder conviction appellant's primary contention is that the Commonwealth failed to prove specific intent to kill, a necessary element of first degree murder, beyond a reasonable doubt. This argument is meritless.

■ The test to be applied in evaluating the sufficiency of the evidence is whether, viewing all the evidence admitted at trial, together with all reasonable inferences which can be drawn therefrom, in the light most favorable to the Commonwealth, the jury could have found that each element of the offense was proven beyond a reasonable doubt. *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102

(1984); *Commonwealth v. Toledo,* 365 Pa.Super. 224, 529 A.2d 480 (1980). Moreover, specific intent to kill, like other elements of a crime, may be established solely by circumstantial evidence. *See Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982); *Commonwealth v. Culbreath,* 439 Pa. 21, 264 A.2d 643 (1970).

In Pennsylvania, first degree murder is defined as an "intentional killing". 18 Pa.Cons.Stat.Ann. § 2502(a) (Purdon 1983). An "intentional killing" is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.Cons. Stat.Ann. § 2502(d) (Purdon 1983). Finally, a killing is "willful, deliberate, and premeditated if it is committed by one who is conscious of his own purpose and intends to end the life of his victim." *Commonwealth v. Stewart,* 461 Pa. 274, 279, 336 A.2d 282, 285 (1975) (footnote omitted). Whether or not the assailant intended to end the life of his victim can be proven by the circumstances of the event, for rarely is the killing accompanied by a direct statement of intent by the defendant. *Commonwealth v. Harvey,* 514 Pa. 531, 526 A.2d 330 (1987). One of the most commonly recognized circumstances from which the jury can infer a specific intent to kill is the use by the defendant of a deadly weapon on a vital part of his victim's body. *See, e.g. Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987); *Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982); *Commonwealth v. Crowson,* 488 Pa. 537, 412 A.2d 1363 (1979). As the Supreme Court has emphasized: "[I]f a deadly force is knowingly applied by the actor to the person of another, the intent to take life is as evident as if the actor stated the intent to kill at the time the force was applied." *Commonwealth v. Harvey,* 514 Pa. 531, 538, 526 A.2d 330, 334 (1987).

In the instant case, appellant does not, nor reasonably could he, argue that the Commonwealth failed to prove that it was he who took the life of Herbert Wenger. Instead he contends that the evidence was equally consistent with a "tempestuous quarrel between gay lovers" and

therefore no specific intent to kill can be drawn from the fact that the Commonwealth proved that appellant shot his victim once through the base of his neck and then again directly through the head. Contrary to appellant's argument, we conclude that there is absolutely nothing in the record to negate the inference of a specific intent to kill. We decline to impute "passion" to the killing, as appellant suggests, merely because the decedent and the defendant were sexually involved. There was absolutely no evidence of a struggle or of the "quarrel" to which appellant alludes. The reasonable inference from the testimony is that appellant shot the unarmed Wenger first through the base of his neck and that following this shot Wenger said "no" and asked appellant to "stop". Appellant responded to this by shooting Wenger a second time through the head.[8] The jury reasonably could infer that the "angry", "loud" voices that Wenger's upstairs neighbor overheard after she was awakened by what can only be assumed to be a gunshot, were the product of Wenger's realization that appellant was about to take his life. In fact, despite appellant's contention, no contrary inference can be drawn on this record.

Appellant also contests the sufficiency of the evidence to support his robbery conviction. Robbery is committed if, in the course of committing a theft, a person physically removes property from another by force. 18 Pa.Cons.Stat.Ann. § 3701; *Commonwealth v. Brown*, 506 Pa. 169, 484 A.2d 738 (1984). In this case the jury heard evidence from which it could conclude that appellant shot and killed the victim and took his wallet, credit cards, identification, house keys, car keys, car and safe deposit box keys. From this the jury could have found every essential element of robbery proven beyond a reasonable doubt. The case upon which appellant relies to suggest the opposite, *Commonwealth v. Simpson*, 436 Pa. 459, 260 A.2d 751 (1970), is wholly inapplicable. In *Simpson*, the

8. The evidence further suggests that prior to the shot through the head, appellant's weapon misfired, lending additional weight to the conclusion of a specific intent to kill.

evidence was that the defendant was seen leaving a used car lot to test drive a car with the victim. The victim was never seen nor heard from again and was eventually discovered months later. When the victim was finally found his body was badly decomposed. The medical examiner could find no traces of trauma nor could the cause of death be determined. In fact, death by natural causes could not be ruled out. Under these circumstances the Supreme Court in *Simpson* concluded that "if a dead body is to be used as the only evidence to establish a taking by violence ... [death] must ... be consistent with a violent act." 436 Pa. at 465, 260 A.2d 751. Since the evidence in *Simpson* could not show that the defendant employed violence, the robbery conviction was overturned. Obviously the same cannot be said in the instant case. It is beyond dispute that appellant employed "violence" to accomplish the taking here and his conviction for robbery was sustained by ample evidence.

Appellant's next allegation on appeal is that the trial court improperly restricted voir dire. Specifically he claims that the trial court disallowed certain questions by defense counsel which would have probed prospective jurors' bias on race and homosexuality. Appellant contends that greater latitude in voir dire was necessary because the instant case involved a black defendant and a white victim who were in a homosexual relationship. We have carefully examined the record and conclude that the trial court properly and thoroughly conducted voir dire.

The purpose of voir dire is to ensure a fair, competent, impartial and unprejudiced jury. *See, e.g., Commonwealth v. White*, 366 Pa.Super. 538, 531 A.2d 806 (1987); *Commonwealth v. Hamm*, 325 Pa.Super. 401, 473 A.2d 128 (1984). However, the scope to be allowed each party in exploring the possible biases which may bear on the impartiality of jurors is a matter which rests in the sound discretion of the trial court. *Commonwealth v. Richardson*, 504 Pa. 358, 473 A.2d 1361 (1984). Absent palpable error, a trial court's decision in this regard will not be disturbed. *Commonwealth v. Merrick*, 338 Pa.Super.

495, 488 A.2d 1 (1985). We are persuaded that, given this standard, the trial court in no way abused its discretion.

In support of his argument that voir dire was impermissibly restricted, appellant attempts to characterize this as a "racially sensitive" case. As a result, he contends, the trial court should have allowed greater than usual latitude in probing racial bias. However, we find nothing in the record of this case to support the notion that it was racially sensitive. Our Supreme Court has held that a prosecution cannot be characterized as racially sensitive for purposes of voir dire inquiry by the mere fact that the defendant is black and the victim is white. *Commonwealth v. Richardson*, 504 Pa. at 362, 473 A.2d at 1363. Race was not a factor emphasized in the evidence by either side in the instant case. More importantly, on the issue of race as well as on the issue of possible prejudice stemming from the fact that homosexual activity was referred to in the case, the trial court both permitted and asked numerous questions probing bias on these points with all the prospective jurors.[9] Defense counsel repeatedly explored the impact that the defendant's race and sexual preference might have on the impartiality of potential jurors. He was permitted to ask each juror whether appellant's homosexuality would prejudice him or her. In addition, the trial court also assured itself through extensive questioning that the issues of homosexuality and race bias would not impact on the decision-making process. Compared to the wide latitude the trial court did allow defense counsel, the few instances wherein he restricted questions probing the jurors' personal viewpoints on the morality of homosexuality hardly constituted an abuse of discretion. The trial court's obligation to see that appellant was tried by an impartial jury was fulfilled by the scope of voir dire he allowed.

**9.** For example, prospective jurors were asked whether the fact that appellant was black and the decedent white would affect their impartiality or ability to render a fair verdict. Defense counsel asked each juror whether the introduction of evidence about homosexual activity would impair the juror's judgment. Often, either the court or defense counsel would follow up with further questions developing this area of potential bias.

Appellant also asserts that the trial court committed reversible error by permitting a line of questioning concerning the fact that Herbert Wenger was known by his friends and neighbors to be fastidious and protective in the care and use of his car. Appellant cannot prevail on these arguments which have either been waived or are wholly without merit.

At trial the Commonwealth called as witnesses several friends and neighbors of Herbert Wenger who testified to his disappearance and the discovery of his body, as well as to certain other aspects of his personal life. The first such witness was Wenger's upstairs neighbor, Mary Francis Carolan, whose testimony covered the sounds and activities she observed the night of Wenger's murder. After establishing that Carolan had been the upstairs tenant in Herbert Wenger's house for three to four years and that during that time Wenger had consistently parked his car outside their front door, the prosecutor asked Carolan whether she had ever known Wenger to loan his car to anyone. Carolan replied that he was very "particular" with his "things", especially his car. This line of questioning was never objected to by defense counsel and any objection to it was thereby waived. Moreover, when the Commonwealth pursued a similar line of inquiry with other close friends of the decedent, and defense counsel did object, the trial court properly overruled the objections. These witnesses were testifying from long-time personal experience and observation of the decedent and his habits and the testimony elicited cannot be characterized as "hearsay". Furthermore, defense counsel was permitted on cross-examination to attempt to undo the impact of their testimony by having the same witnesses admit that although they personally had never seen Wenger loan his automobile to anyone, he may have deviated from his policy on occasions of which they were not aware. The trial court did not err in connection with this testimony.

Appellant further complains that he is entitled to a new trial because the prosecutor engaged in improper and preju-

dicial argument during his closing argument. The specific contention is as follows. At trial the medical examiner introduced evidence that one of the bullets that hit Wenger on the night he was killed entered his body where his shoulder adjoins his neck and travelled downward to eventually lodge in his spine. Both defense counsel and prosecutor sought to explain the trajectory of the bullet during his closing argument. Defense counsel invited the jury to speculate that the angle of the bullet was explained by a "struggle" between appellant and Wenger during which Wenger was possibly "leaning forward to tackle" appellant. The prosecutor, on the other hand, suggested to the jury that the evidence did not "suggest a struggle" but that "the angle of the bullet suggests perhaps that the deceased, before the first shot, base of the neck and shoulder, was on his knees pleading for a life perhaps because the man held a gun to him....". Defense counsel's objection to the remark by the prosecutor was sustained. Appellant now claims that the prosecutor's argument entitles him to a new trial. We do not agree.

While a prosecutor may not engage in argument that appeals to bias and hostility in the jury or which stigmatizes the defendant so thoroughly that the jury can no longer deliberate dispassionately on his guilt or innocence, every objectionable remark will not result in a new trial. *Commonwealth v. Goins*, 508 Pa. 270, 530, 495 A.2d 527, 530 (1985). Only remarks which have the "unavoidable effect" of prejudicing the jury require reversal. *Commonwealth v. Graham*, 522 Pa. 115, 560 A.2d 129, 130–31 (1989). The prosecutor's language has to be evaluated in the context of the trial and the evidence. *Commonwealth v. Smith*, 490 Pa. 380, 388, 416 A.2d 986, 989 (1980). Here, while the prosecutor's remarks may have overstepped the bounds of permissible argument, it is clear from the context in which they occurred that they were attempts by the Commonwealth to counter the defense's speculative "theory" of the killing. Moreover, the argument was based on the properly admitted evidence of the bullet's trajectory and

the further evidence that the words "no" and "stop" were heard between the gunshots on the night of the murder. Finally, the objection to the prosecutor's argument was sustained and the trial court frequently admonished the jury that their memory and assessment of the evidence governed their deliberations and that therefore they were to disregard anything to the contrary said by either counsel or the court. *See Commonwealth v. Scarpino*, 494 Pa. 421, 431 A.2d 926 (1981). Under these circumstances we cannot conclude that appellant is entitled to a new trial.

 Appellant raises numerous objections to the trial court's instructions to the jury. Appellant admits that "some" of the errors complained of were never addressed by trial counsel. In a belated attempt to pursue the unpreserved claims, appellant now asserts the ineffectiveness of trial counsel for failing to object to these aspects of the court's charge. However, appellant's claim of ineffectiveness is also untimely. The claims must be raised at the first opportunity at which counsel whose ineffectiveness is being claimed no longer represents the defendant, i.e. at post-verdict motions. (See discussion on argument number one in the instant case). This was not done with respect to many of the claims now raised. We will address only those claims of error which have been properly preserved for review.

Appellant argues that the trial court erred in instructing the jury on the crime of robbery since there was insufficient evidence of a forcible taking. In essence this argument duplicates the sufficiency claim which we have addressed earlier in this opinion. Suffice it to say that there was ample evidence upon which the jury could conclude that appellant shot and killed his victim in the course of a theft of his car, keys, wallet and other personal property.

 Appellant also disputes the trial court's charge to the jury on flight and concealment. In its instructions the trial court advised the jury on the settled rule of law that when a defendant has reason to know that he may be

suspected in connection with a crime, the jury may infer a consciousness of guilt from that person's flight or other evasive conduct. *See Commonwealth v. Harvey*, 514 Pa. 531, 526 A.2d 330, 334 (1987); *Commonwealth v. Whack*, 482 Pa. 137, 393 A.2d 417 (1978). This instruction was clearly warranted by the testimony regarding appellant's evasive and suspicious conduct during the automobile accident with the Sears repair truck a few days after Wenger's murder. Any argument on the strength of the inference to be drawn from appellant's conduct was properly and adequately addressed to the jury as finders of fact in their task in assessing the appropriate weight to be given the evidence. The trial court's charge correctly stated the law, was supported by the evidence at trial and left the evaluation of the evidence in the hands of the jury.

■ Next appellant claims that the trial court improperly characterized the instant case as a "murder" case to the jury, thus impermissibly conveying to the jurors his personal view of the guilt of the defendant. We note that defense counsel took no note of this allegedly prejudicial conduct on the part of the court and therefore counsel's ineffectiveness for failing to object is asserted. Appellant has failed to sustain his burden of establishing ineffectiveness in this regard. *Commonwealth v. Thomas*, 372 Pa.Super. 349, 539 A.2d 829 (1988). Counsel cannot be deemed ineffective for failing to raise a meritless claim such as the one at issue here. Of course the defendant in this case was being prosecuted for murder and the trial court could properly instruct the jury that the informations so stated without overstepping the bounds of proper judicial conduct. The trial court's jury charge taken as a whole squarely and repeatedly placed the burden of proof for all elements of all charges on the Commonwealth. The court's instructions further emphasized the necessity of the jury's exercise of independent judgment on the evidence, free from any opinions it may have sensed from either counsel or bench. Appellant's claim here is meritless.

Finally, with repect to the court's charge, appellant contends that it was error for the trial court to deny a suggested charge to the jury on involuntary manslaughter. Absent evidence which could reasonably have supported an involuntary manslaughter verdict, appellant is not entitled to the charge. *See Commonwealth v. Williams*, 490 Pa. 187, 415 A.2d 403 (1980); *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399 (1980). In the instant case there was no evidence which reasonably would have supported a verdict of involuntary manslaughter. The trial evidence, which has been discussed at length elsewhere in this opinion, simply could not support a finding of reckless or grossly negligent conduct as appellant has urged. Therefore, the trial court correctly refused to charge on this point.

Appellant's last argument on appeal is that the trial court erred in failing to suppress the evidence seized from his home pursuant to the search warrant. Appellant claims that the warrant affidavit failed to establish probable cause.

This court must review the probable cause determination in a search warrant affidavit in a "common sense, non-technical, ungrudging and positive manner". *Commonwealth v. Jones*, 506 Pa. 262, 269, 484 A.2d 1383, 1387 (1984). Whether a search warrant was validly issued depends upon the totality of the circumstances. *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985). Finally, we approach warrant affidavits in a practical, realistic manner, giving due deference to the judgment of the issuing magistrate. *Commonwealth v. Carlisle*, 348 Pa.Super. 96, 501 A.2d 664 (1985). We conclude that the affidavit here provided sufficient probable cause for the warrants to issue. The affidavit stated that Wenger had been found dead of multiple gunshot wounds from a .25 caliber weapon. It further averred that appellant was arrested while driving the automobile registered in the name of the murder victim. The affidavit stated that the officers stopping appellant knew that the car and its operator were wanted in connection with the homicide and also noted that the decedent's registration was found in appellant's pocket. Finally, the

affidavit stated that the decedent was found without any money, travellers checks or credit cards despite the known fact that he was scheduled to leave on vacation the day his body was discovered. In conclusion, the warrant affidavit stated that the affiants had reason to believe that the weapon and personal items of Wenger can be found in appellant's residence. The affidavit certainly satisfied the requirements of probable cause. It was reasonable to conclude that there was a fair probability that additional items of evidence would be found in the home of the suspect who already was in possession of the murder victim's car and owner's card.[10]

Judgment of sentence is affirmed.

**10.** Appellant raises as separate claim the propriety of a nighttime search of his residence. The warrant was applied for shortly after one o'clock in the morning, just after the police had taken a statement from appellant. The warrant averred that due to the lateness of the hour and the ease with which the highly portable items sought may be concealed or moved, a nighttime warrant was in order. The trial relied on the disposable nature of the items and the high probability that family members would learn of appellant's apprehension which occurred just outside his home. We find that reasonable justification existed for the search to occur at night.