## Commonwealth v. Bocelli

338

*Stuart Suss*, for the Commonwealth.
*Norris E. Gelman*, for the defendant.

WOOD, *P.J.*, November 2, 1994—

## BACKGROUND

On July 19, 1991, a jury convicted Christopher Bocelli of first degree murder, robbery, aggravated assault and criminal conspiracy. He filed timely post-verdict motions for a new trial.

## FACTS

Giving the Commonwealth the benefit of all favorable inferences, see *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988), the testimony established the following events:

On October 12, 1990, Timothy Kleinfelter and the defendant went to the Old Maple Inn for drinks and encountered Russell Murdoch. Murdoch was visibly intoxicated, flashing a large amount of cash, and attempting to buy the defendant and his companions drinks. Kleinfelter and the defendant agreed to "roll"

Murdoch. They followed Murdoch out of the bar and gave him a ride. The defendant pulled over alongside a construction site. Kleinfelter dragged Murdoch from the car and started to attack him. The defendant joined in on the attack by kicking and punching until Murdoch fell to the ground.[1] Murdoch was robbed, beaten with a crowbar and stabbed to death. Kleinfelter and the defendant returned to the scene later in the evening to move the body into the woods.

On October 20, 1990, the state police arrested the defendant and committed him to Chester County Prison. While awaiting his trial, the defendant had several conversations regarding the murder with a fellow inmate, Frank Rivera. The defendant also wrote notes regarding the murder and gave them to another fellow inmate, Jerry Warner, for editing and rewriting. On November 27, 1990, Rivera told police that he had overheard the defendant tell Warner that he would arrange bail for Warner if Warner would prevent a certain witness from testifying. Warner confirmed the substance of this agreement. On July 2, 1991 Rivera told police that in late April or early May 1991 he was approached by the prison librarian with an affidavit from the defendant in which Rivera would recant previous statements made to the police. The defendant had offered him money on a prison expense account in exchange for the signed affidavit. On July 3, 1991, police executed a search warrant for the defendant's cell and seized defendant's notes concerning the crime. Defendant moved prior to trial to suppress them, and I granted the motion but permitted their use for impeachment purposes. These

---

1. Defendant claims to have remained in the car, and says he was not aware of Kleinfelter's intentions or actions until after the assault was over. The jury obviously concluded otherwise.

notes were marked as exhibits C-85 and C-86 during the trial, but were not admitted into evidence.

ISSUES

I. *Whether the Commonwealth Improperly Used Exhibits C-85 and C-86 Contrary to My Suppression Order*

The defendant argues that trial counsel was ineffective for failing to object to the prosecution's substantive use of his suppressed statements during cross-examination and in closing argument.

"There are three elements to a valid claim of ineffective assistance. We inquire first whether the underlying claim is of arguable merit; that is, whether the disputed action or omission by counsel was of questionable legal soundness. If so, we ask whether counsel had any reasonable basis for the questionable action or omission which was designed to effectuate his client's interest. If he did, our inquiry ends. If not, the [defendant] will be granted relief if he also demonstrates that counsel's improper course of conduct worked to his prejudice ...." *Commonwealth v. Davis*, 518 Pa. 77, 83, 541 A.2d 315, 318 (1988).

During cross-examination, the prosecutor used exhibits C-85 and C-86 in an attempt to illuminate inconsistencies in the defendant's testimony. The use of a voluntary confession, even a suppressed confession, for impeachment, does not violate the Pennsylvania Constitution or the Fifth Amendment to the United States Constitution. *Commonwealth v. Batson*, 396 Pa. Super. 513, 517, 578 A.2d 1330, 1332 (1990), *appeal denied*, 527 Pa. 591, 588 A.2d 912 (1991); *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1178, 108 L.Ed.2d 293 (1990). Therefore, defense counsel's failure to object to use

by the prosecution of suppressed evidence for impeachment purposes does not demonstrate ineffective assistance of counsel. Such an objection would have had no merit.

Defendant also claims that the Commonwealth improperly used C-85 and C-86 as substantive evidence in its closing argument. In her closing the assistant district attorney argued:

"But then what happened in addition to what he told police officers? He started to write in his cell, and he started to write verbatim accounts of everything that occurred. He told you from the witness stand that he was told of kicking and crowbar, and yet these verbatim accounts, the writings, go into detail of the stabbing, and not just stabbing, but stabbing and where in the body, even stabbing during a struggle, stabbing through the armpit and stabbing in the chest. The person who knows these details, is one who is standing right there, who's helping that act to be accomplished, even one who had the knife." N.T. 7/17/91, 796-797.

It is unclear from the record whether the district attorney was referring to the suppressed writings (C-85 and C-86) or other writings properly admitted into evidence (C-71). In C-85 and C-86, the defendant wrote out his version of the events in the third person:

"On October 13, 1990 Lee Russell Murdoch was not only savagely beaten, and robbed. He was also killed by several stab wounds to the chest area. His body was left carelessly in the woods. Only to be found 10 days later. Badly decomposed. I heard stories from the police where they told me that civilians had smelled the body up to one and a half miles away...." These writings, however, were never displayed to the jury.

On the other hand, Jerry Warner, a Commonwealth witness, testified that he wrote the defendant's own

account of the incident at the defendant's request. These writings were properly admitted into evidence as C-71 and contained a version of events factually similar to those recounted in C-85 and C-86. In C-71, the defendant said that he was forced to return to the scene of the crime to help Kleinfelter move the body into the woods: "He [Kleinfelter] told me to grab a leg. We pulled for several feet. His [Murdoch's] shirt started to ride up his chest. I saw a stab wound to the chest."

In considering whether the prosecutor's remarks were improper, I must note that the Commonwealth is given great leeway in closing argument. *Commonwealth v. Jones*, 530 Pa. 591, 617, 610 A.2d 931, 943 (1992). Further, only those comments whose unavoidable effect is to prejudice the jury will require a new trial. *Commonwealth v. Jones*, 391 Pa. Super. 292, 310, 570 A.2d 1338, 1348 (1990).

In light of these standards, the prosecutor's remark could fairly be characterized as referring to C-71 and urging the jury to follow the Commonwealth's theory of the case and convict on first degree murder. This type of statement is within the bounds afforded a prosecutor on closing argument. Further, this is not the type of argument whose "unavoidable effect" is to prejudice the jury. C-71 and other evidence amply proved that the defendant had knowledge of where the victim was stabbed. Finally, I instructed the jury that counsel's remarks are not evidence. N.T. 7/10/91, 57. They were free to accept or reject her assertions.

In reviewing the prosecutor's remarks together with all the evidence presented in a very lengthy trial, I must conclude that trial counsel was not ineffective for failing to object and the defendant is not entitled to a new trial on the basis of this claim.

## II. *Whether Trial Counsel Was Ineffective for Failing To Object to My Charge Regarding Prior Inconsistent Statements*

The defendant also asserts that counsel should have challenged my instruction permitting the jury to consider prior inconsistent statements as substantive evidence. N.T. 7/18/91, 767. The defendant argues that this charge invited the jury to consider the suppressed statements as substantive evidence rather than limiting their use to impeachment. However, this charge was correct as applied to the prior inconsistent statements of all of the non-party witnesses at the time of the trial. See *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986).[2] As noted, a defendant *may* be impeached by prior inconsistent statements, and since these statements were never read nor shown to the jury, there is no danger that they were treated as substantive evidence. Therefore, counsel's failure to object cannot form the basis for an ineffectiveness claim.

## III. *Whether the Defendant's Suppressed Statements Were Privileged*

The defendant argues that his suppressed writings were totally inadmissible by virtue of the attorney-client privilege, the therapist-patient privilege, and his expectation of privacy regarding the documents.

---

2. I note that since the trial, *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992), has limited *Brady*. In *Lively*, the Supreme Court held that a prior inconsistent statement may be considered as substantive evidence "only when the statement is given under oath at a formal legal proceeding; or the statement had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements." *Lively, supra* at 471, 610 A.2d at 10.

The attorney-client privilege protects confidential communications between an attorney and his client. 42 Pa.C.S. §5916. The attorney is not permitted and cannot be compelled to disclose confidential communications without the consent of his client. *Commonwealth v. Maguigan*, 511 Pa. 112, 124, 511 A.2d 1327, 1334 (1986). Notes taken during privileged communications are protected to the same extent as the discussions between an attorney and his client. *In re: Investigating Grand Jury of Philadelphia County*, 527 Pa. 432, 441, 593 A.2d 402, 407 (1991). However, the privilege does not extend to communications which the client reveals to third parties because disclosure destroys the confidential nature of the communications. See *Commonwealth v. Boyd*, 397 Pa. Super. 468, 580 A.2d 393 (1990) and *Commonwealth v. Goldblum*, 498 Pa. 455, 447 A.2d 234 (1982).

The confidential relations and communications between a psychiatrist or psychologist and his patient are protected to the same extent as communications of attorney and client. 42 Pa.C.S. §5944. In *Commonwealth v. Eck*, 413 Pa. Super. 538, 605 A.2d 1248 (1992), the Superior Court addressed the scope of 42 Pa.C.S. §5944 and held that the statute afforded an absolute privilege to information acquired by a psychiatrist or psychologist during the course of treating a patient. This privilege also applies to records created in the course of the confidential relationship. *Id.*

In this case, the defendant says he wrote down his memories of the murder in a therapeutic journal (C-85, C-86) at the direction of his psychologist, to help alleviate a sleep disorder. He also asserts that he kept this therapeutic journal at the request of his attorney to help prepare his defense. These writings were dictated to and edited by a fellow cell-mate. N.T. 7/15/91, 218.

The defendant gave up any privilege he may have enjoyed in these documents by sharing them with persons other than his attorney and psychologist. Therefore, counsel was not ineffective for failing to assert a privilege in these documents.

The defendant also asserts that use of the suppressed materials violated his Fourth Amendment right to privacy. This argument is without merit. I found that the police search of the defendant's cell was unreasonable because the warrant was over-broad; it gave the executing police officer the discretion to pick and choose among the defendant's writings to decide which items to seize. See *Commonwealth v. Iannelli*, 430 Pa. Super. 402, 428-29, 634 A.2d 1120, 1135 (1993). Therefore, I suppressed those items seized which were outside the scope of the search warrant. However, I permitted their use for impeachment purposes because "[i]f a defendant exercises his right to testify on his behalf, he assumes a reciprocal obligation to speak truthfully and accurately, and [the Supreme Court] has consistently rejected arguments that would allow the defendant to turn the illegal method by which evidence is obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." *Michigan v. Harvey*, 494 U.S. 344, 351, 110 S.Ct. 1176, 1800, 108 L.Ed.2d 293, 302-303 (1990).

IV. *Whether Trial Counsel Was Ineffective for Failing To Raise the Issue of Invasion of the Defense Camp*

The defendant argues that the Commonwealth's search of the defendant's cell "invaded the defense camp" and intruded into the defense's strategy, thereby violating the defendant's Sixth Amendment right to counsel. He argues that trial counsel's failure to ask

for the court to replace the prosecutor with one who had no contact with the exhibits C-85 and C-86 constituted ineffectiveness.

In *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972), the Court of Appeals for the Third Circuit reversed a conviction against a defendant where defense trial strategies were discussed with a paid government informant. The court held that where there is a very real likelihood of prejudice, the need to eliminate such prejudice requires reversal. *Ripso, supra* at 977.

In *Commonwealth v. Scarfo*, 416 Pa. Super. 329, 611 A.2d 242 (1992), the Superior Court considered a similar situation. The defendant's co-conspirator had been negotiating a plea agreement with the Commonwealth for two weeks. The defendant argued that the Commonwealth could have kept him with the defense so that they could learn trial strategies and other information. The court explained that while the Commonwealth may need to use members of a criminal conspiracy as witnesses, they may not use cooperating witnesses to infringe on the rights of the remaining defendants. *Scarfo, supra* at 374, 611 A.2d at 264.

The *Scarfo* court was especially concerned about situations where "multiple parties are the subject of a group defense." The court explained that where a defendant is part of a group defense, "it would be reasonable for a defendant to assume that the other defendants are allied with him or her and that the confidentiality of statements made for the benefit of group preparation would stay confidential within the group...." *Scarfo, supra* at 377-78, 611 A.2d at 266. The court noted that "[d]efendants have both the right to prepare a group defense and the right to communicate privately with counsel; constitutional principles forbid requiring a defendant to waive one of these rights in order to exercise

the other." *Id.* The court concluded that an intrusion may have occurred and applying the standard from *Ripso,* noted that there was a likelihood of prejudice to the defendant because "[w]hen the government has access to information discussed by the accused and defense counsel, the potential for devastation to the effective representation of the accused becomes quite real." *Id.*

In this case, there was no "invasion into the defense camp." There was no camp in this case; there was only one defendant and his attorney. The defendant and his co-conspirator had separate trials and different attorneys and the Commonwealth did not attempt to learn defense trial strategies via a co-defendant. Therefore, the special problems attending a group defense are not present here.

Further, it would have made no sense for trial counsel to ask for a new prosecuting attorney after the defendant's suppression hearing because I permitted the Commonwealth to use C-85 and C-86 for impeachment. A prosecutor cannot impeach a defendant without knowing the content of the defendant's admissions. I would have had no reason to replace the prosecuting attorney. Therefore, trial counsel was not ineffective for failing to ask for a new prosecuting attorney.

### V. *Whether Trial Counsel Was Ineffective for Failing To Object to My Charge Regarding Accomplices*

The defendant argues that my instruction on accomplice liability permitted the jury to convict him of first degree murder without a finding that he possessed the specific intent to kill. He asserts that the jury found him guilty of first degree murder as an accomplice

"of a man who deliberately used a deadly weapon on Murdoch." Defendant's brief, pg. 25.

Specifically, the defendant objects to the following language of my charge:

"When deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind. If you believe that the defendant or principal actor with the defendant being an accomplice intentionally used a deadly weapon on the vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill. Now that's first degree murder ladies and gentlemen."

Initially, I instructed the jury on the different degrees of murder and explained that all forms of murder require malice. N.T. 7/18/91, 729. I explained that the defendant could be liable as an accomplice even if he didn't actually participate in the beating of the victim if certain criteria of accomplice liability were met. I defined accomplice liability:

"A person is guilty of this offense if he's committed by his own conduct or the conduct of another person for which he is legally accountable or both. A person is an accomplice of another person in the commission of an offense if with the intent of promoting or facilitating the commission of the offense, he, one, solicits such other person to commit it or, two, aids or agrees or attempts to aid such other person in planning or committing it." N.T. 7/18/91, 730.

I also used standard jury instructions to explain the law on accomplices to the jury:

"A defendant is guilty of a crime if he is an accomplice of another person who commits that crime. A defendant does not become an accomplice merely by being present at the scene of the crime or knowing about the crime. He is an accomplice if, with the intent of promoting or facilitating the commission of the crime, he solicits, commands, encourages or requests the other person to aid the other person in planning or committing it." N.T. 7/18/91, 731.

When I charged the jury on the varying degrees of murder I cautioned them to "bear in mind that these rules apply whether or not one is the principal actor or an accomplice...." N.T. 7/18/91, 737.

I explained the concept of shared intent to the jury:"... an accomplice must have the intent of promoting or facilitating the commission of a crime.... [W]hen we talk about shared intent with respect to first degree murder which is an intentional killing, that means a shared intent to cause death, to participate in that killing or aid and abet in that killing.... When we talk about a shared intent with respect to second degree murder, which is a killing in the perpetration of a felony, what we mean is a shared intent to participate in the commission of that felony...." N.T. 7/18/91, 738.

I restated that "for first degree murder there must be an intentional killing as a principal actor or an accomplice with the shared intent to cause that death." N.T. 7/18/91, 742.

Having reviewed the instructions in their entirety, as I must, I find that the instructions clearly explained that in order for the jury to find the defendant guilty of first degree murder, the jury must find that the defendant intended to kill. See *Commonwealth v. Zet-*

*tlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982). Isolated excerpts of a charge cannot constitute reversible error where, as here, the charge as a whole "sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." *Commonwealth v. Prosdocimo*, 525 Pa. 147, 154, 578 A.2d 1273, 1276 (1990).

## VI. *Whether Incidents of Prosecutorial Misconduct Require a New Trial*

The defendant contends that I should have granted a mistrial based on prosecutorial misconduct. Specifically, the defendant asserts that the assistant district attorney smiled while he testified and that she accused his attorney of prompting his responses in her closing argument.

The decision whether to grant a mistrial is within the sound discretion of the trial judge and will not be reversed absent a flagrant abuse of discretion. *Commonwealth v. Thomas*, 361 Pa. Super. 1, 521 A.2d 441 (1987), *allocatur denied*, 516 Pa. 617, 531 A.2d 119 (1987). Only those improprieties whose unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they would be unable to weigh the evidence presented and render a true verdict require a mistrial. *Commonwealth v. Goins*, 508 Pa. 270, 495 A.2d 527 (1985).

With regard to the smiling, I instructed the assistant district attorney, in front of the jury, to refrain from any inappropriate facial gestures. N.T. 7/17/91, 575. This admonition sufficiently alerted the jury that if the assistant district attorney had in fact smiled, it was improper. Under the circumstances, I cannot say this incident prevented the jury from rendering a verdict based on the evidence.

The defendant's other allegation of prosecutorial misconduct concerns remarks the assistant district attorney made during her closing. Trial counsel interrupted the defendant during cross-examination to tell him "[j]ust answer the question." N.T. 7/17/91, 689. The assistant district attorney then asked "[y]our attorney cut you off right then, didn't he?" N.T. 7/17/91, 689. I then told counsel that I would not permit commentary during questioning. N.T. 7/17/91, 689.

The assistant district attorney argued in her closing that "[the defendant's] a well-rehearsed witness. I would suggest a bit brief in his answers because of certain looks from counsel, because of interruptions and objections. I suggest a bit confused on certain points. He wanted to elaborate and his attorney didn't want him to do so." N.T. 7/17/91, 804.

The assistant district attorney's remarks during closing were in response to the quoted exchange. The jury had a chance to observe this exchange and the defendant's demeanor. I instructed the jury that it was their duty to decide which witnesses were credible. In light of my instructions, I cannot say that these remarks operated to deny the defendant a fair trial.

I now enter the following

## ORDER

And now, November 2, 1994, the defendant's post-verdict motions are hereby denied. The Adult Probation Office shall conduct a pre-sentence investigation. When that is complete, the court administrator is directed to schedule this matter for sentencing on the first available date.