## Ritter v. Waynesboro Hospital

C.P. of Adams County, no. 94-S-455.

*Thomas W. Hall,* for plaintiffs.
*Thomas J. Williams,* for defendant Hospital.
*Michael M. Badowski,* for defendants Rogina, Kehoe and Potomac.

SPICER, *P.J.,* April 9, 1996—Plaintiffs seek to exclude certain defense evidence at trial. This evidence may be broadly described as consisting of testimony of: (a) Richard L. Naeye M.D., who is prepared to state that an in utero injury to Lindsay Ritter occurred 17 hours before birth; (b) the mother, Mary Jane Ritter's, description of herself as a person intensely interested in alternative birthing, who dislikes and distrusts institutionalized health care; and (c) various witnesses who may describe the mother's lack of cooperation with medical personnel not only on the date when the child was born, but also on prior occasions.

Plaintiffs argue that Dr. Naeye's theory, upon which his testimony is based, lacks acceptance in the medical community and that both 42 Pa.C.S. §5929 and Pa.R.C.P. 4003.6 forbid his testifying without the consent of plaintiffs. They further contend that testimony falling into categories (b) and (c) lacks relevance and is based on hearsay.

All parties have submitted extensive arguments through thoughtful and well-researched briefs. This writer regrets that time and other obligations limit the court's discussion, and that we have not addressed each and every point raised in argument. Issues are both complex and important, but trial is scheduled to begin within weeks and a decision is required. Rulings will be briefly explained, but this opinion is hardly intended as a definitive statement in the field of medical evidence.

This is a malpractice action arising out of the birth of Lindsay Ritter. Unfortunately, the child suffers from cerebral palsy and the question is, who, if anyone, is to blame. Ms. Ritter initially planned on a vaginal delivery with the aid of a midwife, Elena Kehoe. Apparently, one of the reasons Ms. Ritter selected Ms. Kehoe was the latter's association with Potomac

OB/GYN Associates, with the resulting professional help that would be available. Complications occurred, requiring hospitalization. Ms. Ritter was taken to Waynesboro Hospital, where birth was accomplished by cesarean section around 11:04 a.m. May 17, 1992.

Briefs portray somewhat conflicting versions of facts. According to plaintiffs, the mother agreed promptly with Ms. Kehoe's recommendation that she be taken to the hospital and that she also promptly agreed to a cesarean delivery. According to plaintiffs, the attending physician and hospital staff then delayed the actual procedure for over an hour and a half, without monitoring Ms. Ritter. Defendants, on the other hand, say that the mother dragged her feet in going to the hospital, then delayed final resolution further by refusing to promptly agree to the cesarean procedure. They also cite examples of dilatory behavior, such as the mother's rejection of certain standard procedures, such as receiving oxygen by mask. They also want to paint a portrait of Ms. Ritter as being a headstrong person who rejected or questioned medical advice on prior occasions.

We make no effort to resolve factual disputes. Plaintiffs' argument may be summarized by saying: (1) what Ms. Ritter may have said or done in the past is not relevant to determine what occurred on May 17, 1992; (2) general descriptions of a resistant or reluctant attitude on her part are not probative; and (3) the lack of specific conduct, such as a refusal, is fatal to defendants' attempts to absolve themselves of negligence or to prove Ms. Ritter contributorily negligent. With respect to this final point, plaintiffs attack descriptions of delay on Ms. Ritter's part which would amount to conduct, as hearsay and, therefore, inadmissible.

On the other hand, defendants contend that the jury should be allowed to view the whole picture, and not be restricted solely to the last 90-some minutes of this unfortunate saga.

It is the court's opinion that Ms. Ritter's conduct on May 17, 1992 is relevant and admissible. Examples of uncooperative behavior prior to that date would not be. If, however, she were to testify that she didn't understand what she was being asked, or took issue with Ms. Kehoe's description of foot dragging, some evidence of her past experiences with, and attitude toward, institutionalized medicine may also be admissible. While it is true that doing an act on one occasion is generally not relevant to prove that the person did a similar act on another, habits, attitudes and state of mind may become probative to explain what occurred on May 17, 1992. See *Commonwealth v. Jones,* 391 Pa. Super. 292, 570 A.2d 1338 (1990).

The record simply does not support plaintiffs' contention that testimony of Terri Waltz was based on hearsay. The witness described a conversation which occurred between Ms. Ritter and others, it is true, but Ms. Waltz was present and heard the conversation. While Dr. Rogina's understanding of the situation was based on what others told him, the issue is whether the assessment was correct, based on the facts.

It must be pointed out that these rulings may change, depending on what is developed at trial. Rulings in limine, in areas such as this, may provide guidance, but final resolution must await trial. It may be true that testimony may not differ from depositions, and we may rule as if an offer has been made. However, it may be that testimony at trial may be developed significantly differently than in the depositions.

The situation may be somewhat clearer with respect to Dr. Naeye, because of the nature of the objections.

The statute, *supra,* provides, in part:

"No physician shall be allowed, in any civil matter, to disclose any information which he has acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries."

The rule, *supra,* provides in part:

"Information may be obtained from the treating physician of a party only upon written consent of that party, or through a method of discovery, authorized by this chapter. This rule shall not prevent an attorney from obtaining information from (1) the attorney's client, (2) an employee of the attorney's client, or (3) an ostensible employee of the attorney's client."

It would seem that the child was transferred to Hershey Medical Center from the Waynesboro Hospital when neurological deficiencies were discovered. Dr. Naeye is a pathologist at Hershey.

As part of her consent, Ms. Ritter released tissue samples for scientific and medical research. When her child went to Hershey, Waynesboro Hospital forwarded the placenta. Dr. Naeye examined it and found what he considered to be evidence of an inflammation, chorioamnionitis, and the presence of infant fecal matter, meconium. He made no pathological findings and apparently the plaintiffs were unaware of his actions until he surfaced as a defense witness.

Neither side has presented Pennsylvania cases on point. Both urge us to consider decisions in other ju-

risdictions. Defendants further argue that the statute was intended to protect communications, not scientific findings.

Dr. Naeye certainly doesn't fit the common image of a treating physician. The record indicates that he provided no advice, care or information. Nonetheless, we cannot agree that communications are the sole subject of protection, or that a doctor and his or her patient must always meet face to face for the former to become subject to restrictions on disclosure. There are times when laboratory and pathology results should be guarded from prying eyes. We think that some relationships are derivative, and it would seem that Dr. Naeye's standing to either Ms. Ritter or to Lindsay would depend upon whether he was requested to perform an examination by a physician engaged in treatment of the child. Nothing indicates this occurred. From the record, it is just as probable that the placenta examination was requested by the Waynesboro Hospital to prepare for a lawsuit. Or, it may have been part of a routine research study.

We, therefore, decline to preclude the testimony because of either the rule or the statute.

A review of Dr. Naeye's deposition indicates that medical science has found no definitive answers as to when injuries may occur which cause neurological deficiencies in newborn infants. The doctor described several causes, including early viral infection, but hypoxia and asphyxia account for 20 percent of such cases. Damage from this latter cause may consist of lesions, caused by partial hypoxia or asphyxia, and more serious injury to deep gray matter caused by severe hypoxia. Means of detecting the time of injury have eluded the profession. Fetal monitoring produces only

a .002 correlation between positive indications of damage and those children actually born with the condition.

Meconium is a cause of hypoxia, because it constricts blood vessels. In the doctor's opinion, many cases which are explained by injuries sustained during delivery are actually attributable to conditions present before the mother arrives at a hospital.

Dr. Naeye appears to be deeply interested in solving a very serious problem. He described his experience in Africa and elsewhere. Reports of high altitude experiments attracted his interest. He said he had to go outside medical literature, since nothing appeared in that field, to pursue his theory. He decided that monitoring lymphocytes could provide a timetable for determining when an injury occurred.

According to the doctor, when hypoxia occurs, the thymus dumps lymphocytes into the blood. The only other triggering cause is bacteria associated with whooping cough. Thus, influx could easily be ascribable to asphyxia and hypoxia. The cells are meant to last, and the high level persists, 24 hours. Because introduction is virtually instantaneous and increased levels limited in time, the cells provide a convenient means of ascertaining the time of an insult or injury. Although a person's lymphocyte count may fall below normal for a number of days, Dr. Naeye says that a normal count of 10,000 occurs 24 hours after injury.

Lindsay's blood indicated a count of 15,700 at birth, 13,462, 30 minutes thereafter and 3,700, 10 hours after birth. From these tests, Dr. Naeye concluded that the normal count of 10,000 occurred seven hours after birth and the injury 17 hours before birth.

Although the doctor said he has considered 91 or 92 cases since, support for his theory is mainly derived from a study of 16 cases. An article describing the

study and its results was published in the very prestigious *New England Journal of Medicine.* However, at a hearing, the court heard testimony from a reviewer, who said if he knew then what he knows now he could never have recommended acceptance of the article. We also heard testimony which established internal inconsistencies and problems with the study.

Initially, the question is by what standard admissibility of scientific theory is judged. Defendants argue that most applications of *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923) involve criminal actions, where the Commonwealth seeks to introduce scientific evidence. They question whether *Frye* applies to civil actions at all, and urge us to follow *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). However, the United States Supreme Court's decision was based on Federal Rule of Evidence 702, and those rules do not apply in this Commonwealth. More importantly, our own Supreme Court has announced that *Frye* remains the rule in Pennsylvania. *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395 (1994).

The *Frye* test is described, *supra,* at page 1014, as follows:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field to which it belongs."

Superior Court has said inquiry is divided into three prongs. First, is the underlying theory generally accepted in the scientific community? Second, do techniques or experiments currently exist capable of producing generally acceptable and reliable results? These two are matters of admissibility. The third is a matter of credibility and concerns whether the testing agency correctly performed the scientific techniques when analyzing forensic samples. *Commonwealth v. Rodgers,* 413 Pa. Super. 498, 605 A.2d 1228 (1992).

The problem is immediately evident. Dr. Naeye's theory is based upon his experiment and is, by his own description, novel. Thus, correct performance is more than a matter of credibility, since the theory is not generally accepted in the community.

Thus, Dr. Naeye may not testify as to the exact time of injury.

This does not end the inquiry, however. Pennsylvania follows a liberal rule of expert testimony in questions of medical causation. Plaintiffs have not argued that theories described by Dr. Naeye, concerning elevated lymphocyte counts triggered by hypoxia, are not supported in the medical community. In fact. Dr. Naeye was apparently upset when Dr. Pereira, a plaintiffs' expert, suggested that there was a well-known association between elevation of lymphocyte counts and response to fetal hypoxia, and that 24 hours were required to normalize the count. (Deposition, 69.)

In *Commonwealth v. Crews, supra,* our Supreme Court held that plausibility studies in the DNA field had not yet gained acceptance. It, therefore, ruled that evidence based on such studies was inadmissible. However, it also held that an expert could say that a match of three out of four loci made identity more probable than not.

We cannot rule out the possibility that Dr. Naeye may testify as to the probability that injury occurred before the mother's arrival at the hospital. If he can say that the opinion is based on principles known and generally accepted in the medical community, and is based upon a reasonable degree of medical certainty, it would seem like the type of medical testimony we hear all the time. However, he may not use his studies as support for the opinion, nor may he describe the exact time of injury.

## ORDER

And now, April 9, 1996, in accordance with the attached opinion, in limine motions are granted in part and refused in part.