J-A31004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MARK D. ROGERS, | |
| Appellant | No. 1203 EDA 2015 |

Appeal from the Judgment of Sentence December 12, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002361-2013

BEFORE:  BENDER, P.J.E., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED FEBRUARY 10, 2017**

Appellant, Mark D. Rogers, appeals from the judgment of sentence of an aggregate term of 25-50 years' incarceration, imposed by the trial court after a jury found Appellant guilty of third-degree murder and related offenses.   In this appeal, Appellant alleges several trial court errors, including a claim that the trial court erroneously refused to issue a jury instruction on involuntary manslaughter.  He also challenges the sufficiency of the evidence supporting his conviction, claims his sentence was an abuse of the trial court's discretion, and asserts that the restitution portion of his sentence was illegal.  After careful review, we vacate Appellant's judgment of sentence and remand for a new trial.

---

[*] Former Justice specially assigned to the Superior Court.

The trial court summarized the facts adduced at trial as follows:

At trial, evidence was presented which[,] when viewed in the light most favorable to the Commonwealth as the verdict winner, established the following. On November 28, 2012, at or around 11:45 p.m., James Logan drove his 1999 red Chevrolet Cavalier to [Appellant]'s house at 5904 Pulaski Avenue. At some point, [Appellant] entered and sat on the passenger side of Mr. Logan's vehicle, removed a loaded .22 caliber handgun, and shot Mr. Logan once on the right side of his head. Mr. Logan's foot then slipped off the brake, causing the car to cruise past the intersection of Pulaski Avenue and Rittenhouse Street and hit a car parked on Rittenhouse Street. This accident blocked traffic and stopped the car Denessa Hardy and Shamae Purnell were inside. While stopped, the women observed a rocking motion inside the victim's vehicle, as if a violent dispute was in progress. As a result, Ms. Hardy called 911 twice. Ms. Hardy and Ms. Purnell later learned that the rocking motion was caused by [Appellant] dragging Mr. Logan's body to the rear of the vehicle.

[Appellant] exited Mr. Logan's vehicle and entered his house where he left behind the gun used in the killing. When [Appellant] returned, he entered the driver side of Mr. Logan's vehicle and drove away. By that time, Officers Robert McCuen and John Terry had responded to the scene and began to pursue the vehicle. Realizing that police were behind him, [Appellant] increased his speed to over 70 miles per hour, and disregarded traffic signals in this residential neighborhood. The vehicle eventually fishtailed and crashed into a [vehicle] parked at Armat and Greene Streets. After this accident, [Appellant] attempted to flee the scene. However, police were on both sides of the vehicle. When [Appellant] exited the driver side, he said[,] "You will have to fucking kill me[,]" and pushed away from Officers McCuen and Terry. Due to [Appellant]'s continued resistance, Officers McCuen and Terry requested additional assistance over police radio. It took approximately eight (8) responding police officers to subdue [Appellant].

After [Appellant] was arrested, Officers Matthew Lally and Anthony Mooney approached the vehicle and observed Mr. Logan lying in the back seat with one gunshot wound on the right side of his head. Officers removed Mr. Logan from the vehicle, and Officer Brian Graves transported him to Temple University

- 2 -

Hospital, where he was pronounced dead on November 29, 2012 at 9:40 p.m.

Dr. Marlon Osborne conducted an autopsy of decedent and testified at trial as a forensic pathology expert. Dr. Osborne concluded to a reasonable degree of medical certainty that the cause of Mr. Logan's death was one gunshot wound to the right side of his head, and that the manner of death was homicide. Dr. Osborne stated that the gunshot wound was 9.8 centimeters below the top of Mr. Logan's head and 4.5 centimeters in front of his right ear opening. The bullet went through Mr. Logan's temporal muscle and temporal bone and entered his brain. The bullet caused lacerations to Mr. Logan's right cerebella hemisphere and right temporal lobe. Dr. Osborne stated that Mr. Logan likely lost all motor function and became immediately comatose as a result of this gunshot wound. Dr. Osborne observed stipple, but no soot on Mr. Logan's head. He stated that the presence of stipple and the lack of soot indicated that the gun was fired between one to three feet from decedent. During the autopsy, Dr. Osborne recovered a projectile from Mr. Logan's head and later submitted it to police.

On November 29, 2012, at about 3:40 a.m., Police Officer Terrance Lewis arrived at Armat and Greene Streets and conducted a walkthrough of the scene. After taking photographs, he recovered one .22 caliber fired cartridge casing from the passenger seat inside the red Chevrolet Cavalier. He later submitted this ballistics evidence to the Firearms Identification Unit for examination. After [Appellant] was arrested, police obtained his biographical information and learned that he lived at 5904 Pulaski Avenue, where Mr. Logan's vehicle was initially parked. Detective Donald Marano, the assigned investigator in this homicide case, obtained a search warrant for [Appellant]'s residence, where upon execution, Officers Lally and Mooney found a firearm on top of a radiator along the east wall of the living room. No other ballistics evidence was found inside [Appellant]'s residence. Officer Lewis assisted with the recovery of the firearm, and found the firearm was jammed. Officer Lewis swabbed the grip, magazine, and trigger area of the firearm for DNA and submitted the swabs to the criminalistics and DNA laboratory for analysis. The firearm was submitted to the Firearms Identification Unit for examination. At trial, the parties stipulated that [Appellant] did not have a valid license to carry a firearm under Section 6109 of the Crimes Code, 18 Pa.C.S. § 6109, or a valid sportsman

firearms permit under Section 6106(c) of the Crimes Code, 18 Pa.C.S. § 6106(c).

Ann Marie Barnes testified at trial as the Commonwealth's expert in firearms identification. Ms. Barnes examined the one projectile removed from decedent's body and one Federal .22 caliber fired cartridge casing recovered from Mr. Logan's vehicle. She also examined the gun recovered from [Appellant]'s residence and described it as a Ruger semiautomatic pistol .22 caliber long rifle that contained three live cartridges. In examining the projectile recovered from Mr. Logan's body, Ms. Barnes observed that it was flat, distorted, and gouged. Although the projectile was unsuitable for microscopic comparison, Ms. Barnes concluded that the bullet was .22 caliber based on its weight. After examining the .22 caliber fired cartridge casing recovered from the vehicle, Ms. Barnes concluded to a reasonable degree of scientific certainty that it was fired from the subject .22 caliber semi-automatic firearm. She also test-fired the firearm and determined that it was operable. At trial, Ms. Barnes noted that the gun was jammed. She also stated that this firearm required three and one-half pounds of pressure to pull the trigger.

Mr. Logan's red Chevrolet Cavalier was subsequently taken to the police garage at Summerdale and Whitaker Streets, where Officer Edward Fidler examined it. Officer Fidler observed that the air bags were deployed inside the vehicle as a result of the accident. The center console was pushed out and lying on the floor. The rear bench seat was halfway folded. There was also heavy damage to the front end of the vehicle. In addition to observing this vehicle damage, Officer Fidler found red stains that appeared to be blood inside the vehicle. As a result, Officer Fidler swabbed the interior handles and controls of all sides of the vehicle and the steering wheel cover. He submitted the swabs to the criminalistics and DNA laboratory for analysis.

Detective Marano arranged for DNA swabs to be taken from [Appellant] and decedent so that they could be used as reference samples during the subsequent DNA analysis. Bryne Strother testified at trial as the Commonwealth's expert in forensic DNA analysis. He received the swabs obtained from [Appellant] and decedent. He also received the swabs that police obtained from the .22 caliber firearm and from the vehicle. Mr. Strother compared the DNA profiles taken from [Appellant] and decedent to the other swabbed evidence. After

examining this evidence, Mr. Strother concluded to a reasonable degree of scientific certainty that decedent was the DNA source of the swab obtained from the rear driver side of the vehicle. Mr. Strother concluded that the source of the DNA from the other swabs obtained from the vehicle were inconclusive.

Mr. Strother also examined the DNA swabs taken from the .22 caliber firearm. He noted that the trace lab report indicated that chemical presumptive tests detected the presence of blood on the grip and trigger area of the firearm. There was no blood detected on the magazine. After comparing the DNA swabs obtained from the firearm to the DNA reference samples obtained from [Appellant] and decedent, Mr. Strother concluded to a reasonable degree of scientific certainty that decedent was a major contributor to the DNA found on the grip and trigger of the firearm. [Appellant] could not be excluded as a minor DNA contributor. Mr. Strother further concluded to a reasonable degree of scientific certainty that [Appellant] was a major contributor to the DNA found on the magazine of the firearm.

At trial, [Appellant] testified that he was acting in self-defense when he shot at Mr. Logan. [Appellant] claimed that Mr. Logan arrived at his residence to collect a drug debt and initially pointed the gun at him. [Appellant] stated that he accidentally shot Mr. Logan in the head as he and Mr. Logan struggled for control of the gun. However, the Commonwealth presented testimony from Dr. Osborne and Ms. Barnes to disprove his self-defense claim. Dr. Osborne stated that he did not discover any burns, scratches, cuts or any other injuries on Mr. Logan's hands. There was no evidence on Mr. Logan's body that indicated he was injured from holding a firearm as it discharged. Ms. Barnes testified that stippling or burns would have been present on Mr. Logan's skin if his hands or arms were near the muzzle of a firearm.

Trial Court Opinion (TCO), 1/16/16, at 2-5.

Following a jury trial which commenced on September 23, 2014, Appellant was convicted of third-degree murder, 18 Pa.C.S. § 2502(c), carrying a firearm on public streets or public property in Philadelphia, 18 Pa.C.S. § 6108, and possession of an instrument of crime (PIC), 18 Pa.C.S.

§ 907. On December 12, 2014, the trial court sentenced Appellant to an aggregate term of incarceration of 25-50 years' incarceration, consisting of consecutive terms of 20-40 years' incarceration for third-degree murder, 2½-5 years' incarceration for the firearms offense, and 2½-5 years' incarceration for PIC. Appellant filed a timely post-sentence motion, which was denied by operation of law on April 17, 2015. Appellant filed a timely notice of appeal on April 23, 2015. On May 11, 2015, Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement, and then filed a supplemental Rule 1925(b) statement on July 22, 2015. The trial court issued its Rule 1925(a) opinion on January 20, 2016.

Appellant now presents the following questions for our review:

1. Did not the trial court err by refusing to instruct the jury on involuntary manslaughter where the jury, even having rejected [Appellant's] claim of self-defense, could nonetheless reasonably have determined that [Appellant] acted in a reckless or grossly negligent manner in causing the victim's death?

2. Did not the trial court err by refusing examination on voir dire of the potential jurors as to whether knowing that a witness was a drug dealer would prejudice them to such a degree that it would prevent them from being able to follow the court's instructions, thus depriving [Appellant] of his right to a fair trial?

3. Did not the trial court err in overruling [Appellant's] objection to improper and prejudicial remarks made by the prosecutor during his summation inasmuch as the prosecutor's statements violated due process by improperly impugning the strategy of the defense and by expressing a personal opinion as to [Appellant]'s guilt, all of which went beyond the bounds of fair advocacy and deprived [Appellant] of his federal and state constitutional rights to due process, a fair and impartial jury, and a fair trial?

4. Was not the evidence insufficient to support the verdict of third[-]degree murder as a matter of law where the Commonwealth failed to disprove beyond a reasonable doubt that [Appellant] did not kill the victim in self-defense?

5. Was not the trial court's imposition of a sentence of the statutory maximum term of 25 to 50 years['] incarceration unreasonable, manifestly excessive and an abuse of discretion where the court failed to conduct an individualized sentencing, based its sentence on inappropriate reasons and ignored whether the sentence was the least stringent one available to protect the community or rehabilitate [Appellant]?

6. Did not the trial court err as a matter of law, abuse its discretion and issue an illegal sentence by ordering [Appellant] to pay funeral expenses in the amount of $21,000 where imposition of such an amount was excessive, the trial court made no inquiries or findings regarding [Appellant's] ability to pay the amount, did not specify any method of payment, and the court required no documentation to prove such amount was not speculative?

Appellant's Brief at 6-7.

Appellant's first claim concerns the trial court's refusal to issue an instruction to the jury on the elements of involuntary manslaughter. He asserts that the court erred, or otherwise abused its discretion, because, "the jury, having rejected [Appellant's] claim of self-defense, could nonetheless reasonably have determined that he acted in a reckless or grossly negligent manner in causing Mr. Logan's death." Appellant's Brief, at 34. The Commonwealth argues that the trial evidence failed to support the crime of involuntary manslaughter and, therefore, the court's failure to issue an instruction regarding that offense was not an error of law or an abuse of the court's discretion. In rejecting Appellant's claim, the trial court stated:

In this case, there was no credible evidence to support the conclusion that the killing was accidental or that it resulted from

[Appellant's] acting in a reckless or grossly negligent manner. Instead, as evidenced by the jury's verdict, [Appellant] exhibited a conscious disregard of an unjustified and extremely high risk of death that warranted a third-degree murder conviction.

TCO at 10.

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Baker*, 24 A.3d 1006, 1022 (Pa. Super. 2011) (quoting *Commonwealth v. Galvin*, 985 A.2d 783, 798–799 (Pa. 2009)). "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S. § 2504. In *Commonwealth v. Garcia,* 378 A.2d 1199 (Pa. 1977), our Supreme Court discussed issues related to the propriety of issuing an involuntary manslaughter instruction as follows:

> Because involuntary manslaughter is a lesser included offense of murder, and because the evidence would support an involuntary manslaughter verdict whenever it would support a murder or voluntary manslaughter verdict, a defendant should be entitled to a requested instruction on involuntary manslaughter in all criminal homicide prosecutions. Allowing the jury to decide the case without adequate instruction as to the permissible verdict of involuntary manslaughter denies the jury information essential to a fair determination of the case. As Mr. Justice (now Chief Justice) Eagen has stated: "In those instances where an involuntary manslaughter verdict would be supported by the evidence, the failure to so acquaint the jury prevents it from operating with full knowledge of the relevant law and precludes the defendant from having a fair trial." *Commonwealth v. Moore*, 463 Pa. 317, 322, 344 A.2d 850, 853 (1975) (plurality opinion).

The need for an instruction on involuntary manslaughter also follows from the Commonwealth's burden of proof. The United States Constitution requires the Commonwealth to prove every element of the offense, including the degree of culpability, beyond a reasonable doubt. **In re Winship**, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Thus, in any case in which the evidence would be sufficient to sustain a verdict of murder or voluntary manslaughter, the jury might conclude that the Commonwealth failed to meet its burden of proving malice, intent, or knowledge, but has proven recklessness or negligence. In order to avoid the possibility that the jury will erroneously convict the defendant of murder or voluntary manslaughter, when only involuntary manslaughter has been proven, a jury instruction on involuntary manslaughter must be given. It is no answer that if the evidence proves involuntary manslaughter only, and no instruction on involuntary manslaughter is given, the jury should acquit:

> True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must as a theoretical matter, return a verdict of acquittal. But the defendant is entitled to a lesser offense instruction in this context or any other precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.[]

**Keeble v. United States**, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 1997-98, 36 L.Ed.2d 844 (1973) (emphasis in original); **see Commonwealth v. Thomas**, 403 Pa. 553, 170 A.2d 112 (1961). The jury should not be forced to choose between a murder or voluntary manslaughter verdict and an acquittal when, properly instructed, the jury would find the defendant guilty of involuntary manslaughter.

It has been argued that an instruction on involuntary manslaughter should not be given in a murder trial because it might confuse the jury. **See Commonwealth v. Nace**, 222 Pa. Super. 329, 331, 295 A.2d 87, 88 (1972) (dictum); **cf. Commonwealth v. Comber**, 374 Pa. 570, 578, 97 A.2d 343, 346-47 (1953) (assault and battery instruction, on a murder indictment, might confuse the jury). We are not convinced that

an instruction on involuntary manslaughter presents a serious risk of confusing the jury.  Indeed, in many cases, it will help to clarify the issues by giving the jury "full knowledge of the relevant law." **Commonwealth v. Moore**, 463 Pa. 317, 322, 344 A.2d 850, 853 (1975) (plurality opinion). The possibility of jury confusion in some cases is not an adequate ground to justify the unfairness of denying a requested instruction on involuntary manslaughter.

A conclusion that an involuntary manslaughter instruction would only confuse the jury is necessarily based on the assumption that, given the evidence presented in the case, it would be wrong to reach such a verdict.  If the evidence proves involuntary manslaughter, and not voluntary manslaughter or murder, it cannot be said that it would confuse the jury to give an involuntary manslaughter instruction.  But the issue whether the evidence proves involuntary manslaughter, and not voluntary manslaughter or murder, is for the jury to decide.  It is the province of the jury to weigh the evidence, and the jury is entitled to believe all, part, or none of the evidence presented. **Commonwealth v. Kahley**, 467 Pa. 272, 356 A.2d 745 (1976); **Commonwealth v. Rose**, 463 Pa. 264, 344 A.2d 824 (1975); **Commonwealth v. Wright**, 458 Pa. 236, 328 A.2d 514 (1974).

The jury's province to weigh the evidence includes the right to believe all, part of, or none of the testimony of a particular witness.  **Commonwealth v. Marlin**, 452 Pa. 380, 305 A.2d 14 (1973); **Commonwealth v. Oates**, 448 Pa. 486, 295 A.2d 337 (1972); **Commonwealth v. Petrisko**, 442 Pa. 575, 275 A.2d 46 (1971).  Thus it is not grounds to deny an involuntary manslaughter instruction that the Commonwealth's evidence, if believed, would prove murder or manslaughter, and the defendant's testimony, if believed in its entirety, would require a verdict of not guilty.

**Garcia**, 378 A.2d at 1208–09 (some internal questions marks omitted).

Here, the trial court rested its decision to refuse an involuntary manslaughter instruction on two pillars: first, that there was no "credible" evidence supporting an involuntary manslaughter verdict; and second, that the jury's third-degree murder verdict itself demonstrated the inapplicability

of that instruction. Neither of these justifications finds any support in our case law.

As discussed in **Garcia**, **supra**, in a jury trial, it is exclusively within the jury's power to weigh the credibility of the evidence, testimonial or otherwise. As such, the trial court's assertion that no "credible" evidence supported involuntary manslaughter appears to breech that maxim on its face. The court appears to have simply judged testimony supporting an involuntary manslaughter verdict to not be credible. This posture stands in stark contrast to those cases where our appellate courts have affirmed a trial court's refusal to give an involuntary manslaughter instruction.

The only case cited by the trial court in reference to the instant claim is **Commonwealth v. Fletcher**, 986 A.2d 759 (Pa. 2009).[1] The trial court made no effort in its opinion to compare and/or contrast that case with the instant one, but instead merely cited it for boilerplate language defining the offense of involuntary manslaughter and the holding that: "An instruction on involuntary manslaughter is not required unless it has been made an issue in the case and the facts would support such a verdict." TCO at 10 (quoting **Fletcher**, 986 A.2d at 791).

---

[1] The trial court cited other cases dealing more generally with boilerplate jury instruction law. However, **Fletcher** was the only case cited by the court which dealt specifically with involuntary manslaughter instructions, albeit in the context of an ineffective assistance of counsel claim, not, as here, where the instruction was requested and refused.

However, *Fletcher* does not support the trial court's decision. *Fletcher* did not deal with a claim raised on direct appeal. Instead, in that case, Fletcher claimed on collateral review that his trial counsel was ineffective for not seeking an involuntary manslaughter jury instruction during trial. The *Fletcher* Court rejected this claim, not because of a lack of *credible* evidence supporting an involuntary manslaughter verdict, but because *no evidence* supported such a verdict. In somewhat factually similar circumstances to the instance case, Fletcher testified that he and his victim had struggled over the victim's gun before Fletcher shot the victim.[2] However, unlike Appellant's testimony in this case, Fletcher had testified that he "rushed in and we struggled. I got my hand on the gun and I fired it two times toward his leg." *Id.* Thus, Fletcher had admitted that he had *intentionally* shot his victim, albeit immediately after struggling for the gun. Consequently, an involuntary manslaughter verdict would not have been supported by *any* evidence or *any* testimony in that case. It was not, therefore, necessary to judge the credibility of any specific evidence or testimony in order to determine the applicability of the involuntary manslaughter instruction. Accordingly, the *Fletcher* Court determined that Fletcher's counsel had not been ineffective for failing to request such an instruction.

_____

[2] Other evidence suggested that Fletcher killed the victim in cold blood, with his own gun, and that there was no struggle over a weapon.

Here, however, Appellant did not admit to intentionally shooting the victim, Mr. Logan. Instead, his testimony could have supported a finding that he acted recklessly or negligently in causing the victim's death in a struggle over the gun. After stating that the victim struck him in the head with the gun, Appellant testified as follows:

Q. When that happened, what did you do?

A. I was shocked that he hit me. He pulled back and went to swing again. I grabbed his arm and the butt of the gun.

Q. Did you grab his arm around in this location on his wrist area?

A. No. I don't remember. I grabbed--

Q. You show us, if you remember.

A. [He] [s]macked me in the head, boom, and pulled the gun back and smacked me and I pulled the butt of the gun. I'm grabbing his arm with this hand and he got his hand on the barrel and reached over and we both tussling with all four arms. *The tussle went on for about 30 seconds and I pushed off and the gun went off.* Boom!

I looked, the gun fell. I look at myself and make sure I wasn't shot. I seen the blood trickling from his head. "What the fuck." In the front of my house, I don't know what I'm going to do, seriously.

…

Q. When you grabbed it, what were you trying to do?

A. *I was trying to take the gun out of his hands so I can leave out the car and go in the house.*

Q. *Were you trying to take the gun so you could defend yourself?*

A. *Take it out of his hands and run in the house.* That's the reason I didn't get out of the car in the first place, because I

- 13 -

didn't know [if] he would shoot me. I never seen that side [of him] before. That's not his character.

N.T., 9/24/14, at 142-144 (emphasis added). Thus, Appellant testified that his intent was solely to disarm the victim, not to use the weapon against him once he was disarmed. He also testified that the gun went off during the struggle, not that he won control of the firearm and then intentionally fired it, as had happened in *Fletcher*. If believed by the jury, this testimony could have supported an involuntary manslaughter verdict.

The Commonwealth cites several cases which ostensibly support the trial court's decision not to instruct the jury on involuntary manslaughter. In each of these cases, the appellate court rejected the appellant's claim that the trial court should have issued an involuntary manslaughter instruction. With respect to each of these cited cases, the Commonwealth provides very minimal analysis, and often fails to offer even the most rudimentary of factual comparisons to the instant case. Nevertheless, despite the Commonwealth's poor presentation of these legal authorities, we will address each of its cited cases in turn.

The Commonwealth first cites *Commonwealth v. Boczkowski*, 846 A.2d 75 (Pa. 2004). The facts of *Boczkowski* are clearly distinguishable from the instant case. There, "[t]he physical evidence, … including the bruising and injuries indicating that [the victim] had died from manual strangulation, would not support an involuntary manslaughter conviction." *Id.* at 460. In other words, it was simply not plausible that Boczkowski had recklessly or negligently strangled his victim to death. Here, however, it

- 14 -

was at least possible, pursuant to Appellant's testimony, that the gun went off during a struggle, rather than by means of an intentional, malicious act. While the only evidence of a struggle was Appellant's testimony, the lack of corroborating evidence cannot completely disprove or discount Appellant's version of events to such an extent that the trial court was entitled to deprive the jury of the choice to believe him. It is not impossible that Appellant and his victim failed to inflict visible physical wounds on each other during the course of a brief struggle over the gun. And, although there was expert testimony regarding an expectation that the victim's skin would show evidence of stippling or burns if his hands or arms were near the muzzle of a firearm when it discharged (and no such wounds were discovered), there was no evidence presented that the victim had hold of *the muzzle,* rather than some other part of the weapon, when it discharged and killed him.[3]

_____

[3] Although Appellant testified that the victim's hand was on the muzzle at some point during the struggle for the gun, he also stated that the struggle went on for 30 seconds before the gun discharged. That is simply not identical to a claim that the victim had his hands around the muzzle at the moment it fired. Moreover, although the medical examiner stated that there were no wounds on the victim's body that were consistent with being near the muzzle when it fired, N.T., 9/24/14, at 31, she admitted on cross-examination that, when she received the victim's body for purposes of conducting the autopsy, his clothes had already been removed, **id.** at 38. In reviewing the transcripts of this testimony, this Court could not find any testimony to the effect that such wounds could be inflicted *through* clothing, nor was there any testimony that the victim was sleeveless when this late-evening, late-November shooting occurred. Given all these attendant circumstances, the lack of wounds on the victim's hands or arms does not render impossible (or virtually impossible) Appellant's claim that the gun went off during a struggle. To afford such weight to the lack of burn or

*(Footnote Continued Next Page)*

- 15 -

Second, the Commonwealth cites **Commonwealth v. Keaton**, 341 A.2d 999 (Pa. 1981). However, that extremely brief opinion provides little more than the boilerplate language that "[i]nvoluntary manslaughter was not made an issue before the trial court and no evidence whatsoever was presented to support a finding that the death was caused by the reckless or negligent act of another." **Id.** at 1000. It does state, however, that Keaton "testified that he was asleep at the time when the killing occurred." **Id.** Keaton could not have acted negligently, recklessly, or with any degree of criminal *mens rea* for that matter, while asleep. Here, however, Appellant's testimony - if believed - could have supported an involuntary manslaughter verdict. He testified that the shooting was an accidental result of the struggle for the victim's gun. That struggle could have reasonably been

*(Footnote Continued)* ———————

stippling wounds, so as to preclude an involuntary manslaughter verdict, there must have been some certainty that the victim's hands or arms *must have been injured* by the firing of the weapon, but no such certainty is provided by Appellant's testimony or any other evidence in this case. At best, one can surmise that such wounds were *likely*, but not *necessary* to corroborate Appellant's version of events. By contrast, in **Boczkowski**, and in the cases discussed below, there was often evidence that clearly prohibited a reasonable conclusion that the killing that occurred was unintended and accidental rather than intentional and malicious. In **Boczkowski**, because the manner of death was determined to be manual strangulation, an accidental death could be completely ruled out. The physical evidence presented by the Commonwealth in this case could not provide that degree of certainty so as to legally preclude an involuntary manslaughter verdict.

construed by the jury as a criminally negligent or reckless act that resulted in the victim's death.

Next, the Commonwealth cites *Commonwealth v. Walker*, 421 A.2d 172 (Pa. 1980). Like *Keaton*, *Walker* is an extremely brief, undetailed opinion. Nevertheless, as had occurred in *Keaton*, Walker's testimony[4] could not support an involuntary manslaughter verdict. As the *Walker* Court stated, Walker's "defense was that he went to the scene of the crimes anticipating only a 'fair' fistfight, and fled as soon as his fellow gang members drew their knives." *Id.* Thus, Walker, much like Keaton, claimed he was not present when the murder occurred, not that an unintentional killing occurred as the result of an ostensibly negligent or reckless act.

The Commonwealth also cites to *Commonwealth v. Banks*, 677 A.2d 335 (Pa. Super. 1996). However, in that case:

> [D]uring [a] discussion between [the] appellant and the victims seated in their automobile, [the] appellant pulled out a gun, pointed it in the face of Ford[, the murder victim,] and told him to give him the money and drugs. Instead of relinquishing the requested items, Ford stomped on the automobile's gas pedal in an attempt to flee. Eyewitness testimony established that [the] appellant then fired two shots in the automobile.

*Id.* at 343.

---

[4] We assume that the language used by the *Walker* Court to describe Walker's defense arose out of Walker's testimony, or via a statement he made that was admitted at trial. The *Walker* Court briefly explained the "appellant's defense[,]" but did not identify its evidentiary or testimonial source. *Id.* at 173.

Banks requested an involuntary manslaughter charge, which was denied by the trial court. On appeal, he argued the jury could have inferred that the gun was accidentally fired by [the] appellant, that is, the victim's automobile "bumped [the] appellant's hand which caused the gun to be fired." *Id.* The *Banks* Court rejected this argument because

> there was absolutely no testimony from any source that the victim's automobile had bumped anyone's hand or had c[o]me into contact with anyone's body. Also, there was no testimony that the weapon was fired accidentally. In fact, at trial, [the] appellant's defense was that one of his co-defendants had shot the victims, not that the shooting was accidental. Further, [the] appellant's argument that the first bullet was shot when his hand was bumped by the victim's automobile discounts the testimony of eyewitnesses that a second shot was fired after the automobile had pulled away. The firing of a second shot strengthens our decision that the jury could not have inferred that the shooting was merely reckless or grossly negligent.

*Id.* Again, the facts in *Banks* are clearly distinguishable from the case at hand. Banks claimed someone else shot the victim and, regardless, the ostensibly accidental nature of the first shot did not adequately explain the second. Here, however, Appellant testified that the shooting was accidental.

Finally, the Commonwealth cites *Commonwealth v. Jones*, 570 A.2d 1338 (Pa. Super. 1990). In that case, the victim was found lying in his tub, with two gunshot wounds to the head. The appellant was his paramour. In dismissing the claim that the trial court should have issued an involuntary manslaughter jury instruction, the *Jones* Court stated:

> In the instant case there was no evidence which reasonably would have supported a verdict of involuntary manslaughter. The trial evidence, which has been discussed at length elsewhere

in this opinion, simply could not support a finding of reckless or grossly negligent conduct as [the] appellant has urged. Therefore, the trial court correctly refused to charge on this point.

*Id.* at 1349.

Thus, the ***Jones*** case provides virtually no analysis of the relevant evidence in relation to the propriety of issuing an involuntary manslaughter charge. However, given the nature of the wounds (one shot went "through his head[,]" and the other in the back of his neck, which "travelled downward and lodged in his spine"), the position of the victim (lying in his bathtub), and the theft of several items from his residence, it seems quite improbable that the shooting was an accident. ***See id.*** at 1342. Most importantly, there was no testimony or evidence referenced in the ***Jones*** opinion that would tend to support the theory that the shooting was merely the result of negligent or reckless conduct. Although the appellant claimed *on appeal* that the killing was consistent with a "quarrel" between lovers, it is not clear from the ***Jones*** opinion whether Jones testified at his own trial or, even if he had, whether he had claimed that the shooting was accidental. What is known is that Jones claimed in pre-trial statements that he was not present when the victim was murdered. ***Id.*** at 1343. It appears that the theory that the shooting was a result of a struggle between Jones and his victim only arose through defense counsel's closing arguments regarding the medical examiner's testimony about the fatal wounds. It is "well settled in the law that attorneys' statements or questions at trial are not evidence."

*Commonwealth v. LaCava*, 666 A.2d 221, 231 (Pa. 1995). Accordingly, for these reasons, we conclude that *Jones* also fails to support the trial court's decision in this case.

The trial court's opinion suggests that it refused the instruction in question because the evidence supporting it was not "credible." Perhaps the court believed that the other evidence in this case, such as Appellant's attempt to hide the weapon, his flight, and other attendant circumstances, all of which tended to undermine Appellant's credibility and demonstrate his consciousness of guilt, outweighed Appellant's self-serving description of events. And, fairly viewed, there was sufficient evidence available for the jury to discount Appellant's version of events. However, it was for the jury, not the trial court, to decide whether Appellant's account was credible in light of those circumstances. *Garcia*, 378 A.2d at 1209 ("The jury's province to weigh the evidence includes the right to believe all, part of, or none of the testimony of a particular witness."). Indeed, the evidence contradicting Appellant's account was strong, but not iron-clad. It was merely *suggestive* of a guilty mind, and a malicious or intentional killing; the evidence was not absolute or effectively incontrovertible proof of the same. Therefore, the court's first reason for supporting its decision to deny giving an involuntary manslaughter instruction was clearly erroneous and not supported by any case law cited by the trial court or the Commonwealth.

In its brief, the Commonwealth also argues that involuntary manslaughter "was not made an issue in the case[.]" Commonwealth's Brief

at 9. However, as noted above, there was evidence in this case supporting an involuntary manslaughter verdict, because Appellant's testimony, if believed by the jury, could have supported one. Thus, Appellant's testimony made involuntary manslaughter an issue in this case. This is unlike what appears to have happened in **Jones**, where the "theory" of involuntary manslaughter was only vaguely raised during defense counsel's closing arguments. It was not made an issue through the testimony of witnesses or physical evidence. Moreover, the Commonwealth does not argue that this issue was waived due to Appellant's failure to raise it below. Clearly, involuntary manslaughter was 'made an issue in this case' when Appellant testified and then timely requested an involuntary manslaughter instruction below.

The Commonwealth attempts to support this argument further by noting that, when requesting the instruction, Appellant's counsel stated that involuntary manslaughter was not the defense's theory of the case. N.T., 9/24/14, at 179. However, the Commonwealth omits the remainder of defense counsel's contemporaneous remarks:

> Judge, it's not our theory of the case, obviously. However, if there is sufficient issues raised by the fact that the charge should stand, it's our position that involuntary could be – should be read.
>
> We really don't think there is that much to support a first degree murder charge, but, nevertheless, some reasonable jury could come to that conclusion.
>
> However, in this circumstance, since there was a struggle over the gun, the jurors could disbelieve a portion of the defendant's

testimony regarding the gun. They could believe that he had reached for the gun at some time during the time he was in the car and held it in a criminally negligent or reckless way resulting in the death of Mr. Logan. I think that's a reasonable inference from all of the evidence in the car – in the case and that it should be raised, as well.

*Id.*

Whether defense counsel had initially pursued a self-defense claim rather than an involuntary manslaughter based defense is immaterial to what the evidence supported after Appellant's testimony was heard. Indeed, in the wake of Appellant's testimony, self-defense was clearly inapplicable *if* Appellant's version of events was believed in its entirety.[5] While Appellant claimed to be acting in his own defense when he struggled for the weapon, he did not claim to have shot the victim in self-defense; he claimed the gun went off while he and the victim were struggling to control it. The jury could have believed that accidental shooting was a direct result of Appellant's negligent or reckless act of attempting to gain control of the victim's weapon.

The second reason offered by the trial court in support of its decision to deny Appellant's request for an involuntary manslaughter instruction is equally unsound. The court suggests, without much explanation, that the

_____

[5] That is not to say that it was outside the jury's province to reject Appellant's testimony in such a manner that would support his self-defense claim. The jury could have rejected that the shooting was accidental or unintended, but still accepted that Appellant fired the weapon in self-defense just as he won control of it.

jury's guilty verdict on third-degree murder demonstrated that the jury believed that the Commonwealth had sufficiently proven that Appellant displayed "a conscious disregard of an unjustified and extremely high risk of death." TCO at 10. Although the trial court fails to elaborate on the relevance of this reasoning (or cite any cases in support of it), ostensibly the court believed the jury's verdict rendered harmless the court's failure to give the involuntary manslaughter instruction. We must reject this line of reasoning, as it would suggest that claims like the one before us are virtually never reviewable in the appellate courts. If the jury had found Appellant not guilty of all homicide charges, there would be no reason to seek review from the trial court's decision to deny an involuntary manslaughter instruction. Moreover, the Commonwealth - should it ever find cause to request an involuntary manslaughter instruction - is constitutionally prohibited from appealing acquittals.

The issue before us only ever presents itself for review in an appellate court when a homicide conviction more serious than involuntary manslaughter occurs. Indeed, in none of the cases cited by the Commonwealth in support of the trial court's decision does an appellate court even begin to approach this type of reasoning, and for obvious reasons: it is unsound and fundamentally speculative. The issue before us concerns whether sufficient evidence was available to permit the jury to convict Appellant for involuntary manslaughter had the lesser-offense instruction been read by the trial court.

In **Garcia**, our Supreme Court instructed that "[t]he jury should not be forced to choose between a murder or voluntary manslaughter verdict and an acquittal when, properly instructed, the jury would find the defendant guilty of involuntary manslaughter." **Garcia**, 378 A.2d 1208. The **Garcia** Court also stated that, "[i]n order to avoid the possibility that the jury will erroneously convict the defendant of murder or voluntary manslaughter, when only involuntary manslaughter has been proven, a jury instruction on involuntary manslaughter *must* be given." **Id** (emphasis added). Instantly, neither this Court nor the trial court can divine what the jury would have decided had it been given the option to convict Appellant of involuntary manslaughter. Tellingly, in its brief, the Commonwealth does not even attempt to support the trial court's second justification for denying the involuntary manslaughter instruction.

For the reasons set forth above, we conclude that the trial court erred when it denied Appellant's timely request for a jury instruction on involuntary manslaughter. Accordingly, we must vacate Appellant's judgment of sentence and remand for a new trial. Given our disposition in this regard, it is unnecessary to reach Appellant's second, third, fifth, and sixth claims.[6] However, because Appellant also argues that the evidence

_____

[6] Because of our disposition with regard to Appellant's first claim, our decision regarding the remaining issues (but for the sufficiency claim) would merely be advisory in nature. Moreover, it is purely speculative as to whether these issues will arise again in his subsequent trial or, if they do
*(Footnote Continued Next Page)*

was insufficient to support his conviction for third-degree murder, we must address that claim, since it would entitle him to relief greater than that afforded by our granting of a new trial.

Appellant asserts that the Commonwealth failed to present sufficient evidence to disprove his claim that he killed Mr. Logan in self-defense. Specifically, Appellant claims that "the evidence supports [Appellant]'s contention that he was in immediate danger of death or serious physical harm at the time of the shooting." Appellant's Brief at 48.

Our standard of review of sufficiency claims is well-settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

"The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯

arise, whether they would do so under identical circumstances. Accordingly, we decline to address them.

of protecting himself against the use of unlawful force by such other person on the present occasion."  18 Pa.C.S. § 505(a).

> If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt.  **Commonwealth v. Rivera**, 603 Pa. 340, 983 A.2d 1211, 1221 (2009).  "Although the Commonwealth is required to disprove a claim of self-defense ... a jury is not required to believe the testimony of the defendant who raises the claim."  **Commonwealth v. Carbone**, 524 Pa. 551, 574 A.2d 584, 589 (1990).

**Commonwealth v. Houser**, 18 A.3d 1128, 1135 (Pa. 2011).

Appellant premises his contention that the evidence was insufficient to defeat his self-defense theory on the notion that his own testimony provided sufficient evidence in support of that claim.  This argument is poorly constructed, given that Appellant has no burden to prove self-defense. Nevertheless, it was well within the jury's authority to disbelieve Appellant's version of events, in part, or in whole.  **See id.**

Moreover, the Commonwealth presented ample evidence which permitted the jury to reach a reasonable conclusion that Appellant had not acted in self-defense.  There was no evidence supporting Appellant's claim that he struggled with the victim for the gun beyond his own testimony, he stashed the murder weapon in his home immediately following the shooting, he engaged in headlong flight from officers when they arrived at the scene; and he also refused to surrender after the car crashed during that flight, telling the officers that, "[y]ou will have to fucking kill me."  N.T., 9/23/14, at 96.  Our overview of existing case law demonstrates that these

circumstances constituted more than sufficient evidence to disprove Appellant's claim of self-defense. *See Commonwealth v. Jones*, 886 A.2d 689 (Pa. Super. 2005) (holding the evidence sufficient to defeat claim of self-defense, as the fact-finder was free to reject the defendant's testimony establishing that defense, and where the defendant shot the victim in the head at close range); *Commonwealth v. Pestinikas*, 617 A.2d 1339, 1347–48 (Pa. Super. 1992) ("It is well settled that when a person has committed a crime, and knows that he is wanted for it, any attempt by that person to flee or conceal his whereabouts, to escape from custody or resist arrest, to conceal or destroy evidence, to give false statements or testimony, to intimidate or attempt to influence witnesses, or to otherwise engage in conduct designed to avoid apprehension or prosecution for such crime may be admissible as evidence of consciousness of guilt, and may, along with other evidence in the case, form a basis from which guilt may be inferred.").

Appellant acknowledges the evidence of his consciousness of guilt, but argues that such evidence was also consistent with an accidental shooting during a struggle for the gun, or with his self-defense theory. He contends that his attempted concealment of evidence, flight, and resisting arrest were all actions equally congruent with his being in a state of panic or shock following the shooting. We agree that such evidence could be consistent with panic rather than a guilty conscience. However, it was also reasonable for the jury to draw adverse inferences from the same conduct, and "[w]hen reviewing a sufficiency claim[,] *the court is required to view the evidence in*

*the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence*." **Widmer**, 744 A.2d at 751 (emphasis added). Accordingly, we conclude that Appellant's sufficiency claim lacks merit.

In sum, although we conclude that the evidence was sufficient to defeat Appellant's self-defense claim, we must vacate his judgment of sentence and remand for a new trial, because the trial court erroneously refused to issue a jury instruction on involuntary manslaughter. Because of our disposition with regard to these matters, we decline to reach Appellant's remaining claims for relief.

Judgement of sentence **vacated**. Case **remanded** for a new trial. Jurisdiction **relinquished**.

Justice Fitzgerald joins this memorandum.

Judge Moulton concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/10/2017